Christopher J. Reichman  SBN 250485
PRATO & REICHMAN, APC
8555 Aero Drive, Suite 303
San Diego, CA 92123
Telephone: 619-683-7971
Email: chrisr@prato-reichman.com

Attorney for Plaintiff
JONATHAN SMITH

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| JONATHAN SMITH,<br><br>             Plaintiff,<br>      vs.<br><br>VEHICLE PROTECTION SPECIALISTS, LLC, DANIEL LAURENT, SING FOR SERVICE LLC d/b/a MEPCO, and CENTRAL ADMINISTRATIVE SERVICE CORPORATION OF FLORIDA, INC.,<br><br>             Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES, INCLUDING PUNITIVE DAMAGES, INTEREST AND ATTORNEY'S FEES, AND FOR INJUNCTIVE RELIEF**<br><br>**Violation(s) of:**<br>**Telephone Consumer Protection Act of 1991,**<br>**Florida Unfair Practices Act** |

       COMES NOW Plaintiff JONATHAN SMITH (hereinafter referred to as

"Plaintiff") who alleges as follows:

/ / /

- 1 -

## INTRODUCTION

1.     Defendants transmitted at least ninety-one (91) unsolicited telemarketing calls to Plaintiff's wireless phone.  (see below, Factual Summary).

2.     Plaintiff brings this action in accordance with the anti-harassment provisions of the Telephone Consumer Protection Act ("the TCPA") and a supplemental Florida state law operative where Plaintiff resides and where Defendants called him.

3.     The TCPA was enacted in response to widespread outrage about the proliferation of intrusive, nuisance telemarketing and in pertinent part here prohibits unsolicited autodialed telemarketing calls.  *See*, *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012) (statutory purpose and background).

4.     The TCPA also established the National Do-Not-Call Registry ("the DNC Registry") which is a free public database which allows people to list their telephone numbers and thereby indicate their instructions to NOT receive telephone solicitations.  See 47 C.F.R. § 64.1200(c)(2).

5.     Telemarketers are required by law to subscribe to and comply with the DNC Registry.  47 U.S.C. § 227(c)(3) (authorizing creation);  47 C.F.R. § 64.1200(c) (specific regulations); *see*, *also*, 16 C.F.R. Part 310 (complimentary FTC rules).

- 2 -
Complaint

6.    Congress made a finding when it enacted the TCPA in 1991 that "more than 300,000 solicitors call more than 18,000,000 Americans every day". Federal Communications Commission ("FCC"), *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd 14014, at ¶¶ 8 & 66  (FCC 2003).  The FCC made a finding in 2003 that "the number of daily calls [had] increased five fold (to an estimated 104 million) due in part to the use of new technologies such as predictive dialers."  *Id*.  And the increase has continued apace since then.  See, e.g., Brian Fung, Americans Got 26.3 Billion Robocalls Last Year [2018], Up 46 Percent From 2017, Washington Post, Jan. 29, 2019, available at https://www.washingtonpost.com/technology/2019/01/29/report-americans-got-billion-robocalls-last-year-up-percent/

7.    "[U]nwanted robocalls and texts, both telemarketing and informational, top the list of consumer complaints received by" the FCC.   See Omnibus TCPA Order, GC Docket 02-278, FCC 15-72, 2015 WL 4387780 ¶1 (July 10, 2015).  Nearly 50% of all calls to cell phones are now robocalls.  Senate Committee (US) on Commerce, Science and Transportation, *Report 116-41 issued on 5/21/19 for the Telephone Robocall Abuse Criminal Enforcement and Deterrence Act,* page 2.

Complaint

8.    Private party TCPA lawsuits far exceed FCC and FTC enforcement actions under the TCPA, and thus as in antitrust law it is fair to say private enforcement is the primary enforcement of the statute.

## JURISDICTIONAL ALLEGATIONS

9.    Plaintiff is, and at all times herein mentioned was, a resident of the County of Saint Lucie, State of Florida.

10.    Defendant Vehicle Protection Specialists, LLC is, and at all times herein mentioned was, a Limited Liability Company incorporated in Nevada with its principal place of business in the County of Orange, State of California.  (6789 Quail Hill Pkwy, Suite 720, Irvine, CA 92603).

11.    Defendant Daniel Laurent is, and at all times herein mentioned was, the owner of Vehicle Protection Specialists, LLC and a resident of the County of Orange, State of California.

12.    Defendant Sing for Service, LLC d/b/a MEPCO ("MEPCO"), is, and at all times herein mentioned was, a Limited Liability Company incorporated in Delaware with its principal place of business in the County of Cook, State of Illinois.  (205 North Michigan Ave, Suite 2200, Chicago, IL 60601).  MEPCO is a registered trademark of Sing for Service, LLC, registration number 0413622.

13.     Defendant Central Administration Service Corporation of Florida, Inc. ("CARGUARD"), is, and at all times herein mentioned was, a Limited Liability Company incorporated in Delaware with its principal place of business in the County of Hillsborough, State of Florida.  (4830 W. Kennedy Blvd., Suite 600, Tampa, FL 33609).

14.     This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1441 since this case is filed pursuant to the Telephone Consumer Protection Act of 1991, 47 U.S.C. §227 et. seq.  *See*, *Mims v. Arrow Fin. Services, LLC*, 565 U.S. 368 (2012) (federal question jurisdiction confirmed).

15.     The Court has supplemental jurisdiction, under 28 U.S.C. § 1367, over Plaintiff's Florida state-law claims because those claims are based on the same operative facts alleged in the complaint with respect to Plaintiff's TCPA claims and they are so related to claims in the action within the Court's original jurisdiction that they form part of the case or controversy under Article III of the United States Constitution.

16.     At all times herein mentioned each defendant was the partner, agent and employee of each co-defendant herein and was at all times acting within the scope of such partnership, agency and employment and each defendant ratified the conduct of each co-defendant herein.

# **FACTUAL SUMMARY**

17.     Defendants made ninety-one (91) unsolicited telemarketing calls to JONATHAN SMITH's residential wireless phone number (772-370-6848) using an autodialer wherein they tried to automotive service plans on the following dates and times and using the following Caller ID ("CID") numbers and Caller ID name ("CNAM"):

18.     Mr. Smith kept notes regarding each call from Defendants entering information regarding each call immediately after the call occurred, including the date and time of each call, the Caller ID ("CID") number transmitted, whether the call was answered or not and his notes regarding the conversation therein.  He does this with most junk calls he receives since it can be difficult to recall the information later.

19.     A true and correct copy of Mr. Smith's compiled call notes for each call alleged in this case as well as non-actionable calls necessary to identify defendants (discussed below) is attached hereto as Exhibit "1" and incorporated herein as if set forth verbatim.

20.     The date and time of each of Defendants' ninety (90) telemarketing calls is as stated on Exhibit 1 as is the CID number transmitted and the contents of the call.

Complaint

21.     Mr. Smith's residential cell phone has been listed on the federal "Do Not Call" registry maintained by the Federal Trade Commission from December 21, 2004 to the present.

### Examples Showing How All Calls Are Linked To Defendants

22.     None of Defendants' calls plainly stated their true identity at the outset of the calls as required by FCC and various state telemarketing laws, so Plaintiff had to "push 1" in the prerecorded calls to get through to a representative, who also would not honestly identify their company name initially, and so Plaintiff would have to feign interest and play along during at least one call from every Caller ID used by Defendants in making the calls at issue.

23.     Exhibit 1 is sorted by the Caller ID number transmitted in the call (Column D) and Plaintiff gave each CID number used a specific identifier to keep them organized (Column B).  [Column C is Plaintiff's Phone number in all entries].

24.     The specific identifier for each CID number is often related to the name of the sales representative who finally identified himself or herself as being with CarGuard after Plaintiff drew it out of them.  This is the case with the first call in Exhibit 1.

25.     On or about February 24, 2020 at 1:44 PM, Defendants called Plaintiff using an automated dialing system and transmitting CID number

Complaint

+17723613485 attempting to pitch their automobile warranty services and Plaintiff had to play along for over nine (9) minutes before he finally got the sales representative to identify herself as "Christi" with CarGuard, whereupon Plaintiff who was just trying to figure out the caller's identity said he was not interested and asked them not to call anymore.

26.     While this was the only call that used the CID number +17723613485 it was far from the last call.  In fact, Defendants called again just a few minutes later,

27.     On or about February 24, 2020 at 1:51 PM, Defendants called Plaintiff using an automated dialing system and transmitting CID number +19494181217 attempting to pitch their automobile warranty services and Plaintiff had to play along for over eleven (11) minutes before he could get the sales representative to give the company's website, which was CarGuard's site, whereupon Plaintiff who was just trying to figure out the caller's identity said he was not interested and asked them not to call anymore.  (See, Column B entries fro "CarguardAdmin Warr" near end of Exhibit 1, which as mentioned is sorted by CID number not date of calls).

28.     There were numerous other calls from Defendants following this same pattern, for example a spate of thirty-two (32) calls from Defendants using an

autodialing system in March and April of 2020 from CID +17722474227 (identified in Column B as "Carguard 2474227" in Exhibit 1).

29.     Plaintiff missed or was not connected with the representative during the first few calls, but by this point Plaintiff had some experience with Defendants' calls and their CID number patterns and suspected it was them again, so after receiving a bunch of calls from this CID on the morning of March 20, 2020, Plaintiff called the CID number himself and when answered he just asked if this was Carguard and got an affirmative answer before hanging up.

30.     This call is noted in Exhibit 1, Column H as being "Outgoing", meaning made from Plaintiff to Defendant to investigate the identity of the caller, and none of the calls noted as "Outgoing" in Exhibit 1 are included in the tally of ninety-one (91) actionable calls alleged in this case, they are merely left in the call log and notes to show how each CID number Defendants used is traced back to them by their own admission during these investigative calls.

31.     Plaintiff answered multiple calls from CID +17722474227 ("Carguard 2474227") and +17722472952 ("Carguard Amber") because Defendants elected to use these particular CID numbers more often that they did with the others that were cycled through quickly—presumably to evade detection.

32.     During the "Carguard Amber" call on April 3, 2020, after months of abusive junk calling and multiple requests to stop, Plaintiff decided he was going

Complaint

to sue and elected to feign signing up for a warranty just to completely lock down the identity of Defendants.

33.     Defendants took and caused to be made a charge on Plaintiff's bank debit card in the amount of $100, and soon thereafter Plaintiff received by regular USPS mail a VSC booklet that identified VEHICLE and its co-conspirators CARGUARD and MEPCO. Exhibit 2 hereto is portions of this VSC booklet Plaintiff was forced to purchase as a means of identifying Defendants.

34.     Plaintiff was thus able to identify each of Defendants and their relationship to one another which is explained in greater detailed in the "Agency and Damage Allegations" section below.

35.      The foregoing individual call allegations are merely exemplars given in detail to illustrate how Exhibit 1 shows that each CID number used by Defendants to make their autodialed telemarketing calls was positively linked back to them.  Exhibit 1 has been fully alleged and incorporated by reference so Plaintiff will not burden the Complaint with reiterating every entry therein.

36.     Mr. Smith pleads on information and belief that for all calls he did not answer, Defendants called him in order to pitch their automotive service plan services.  Each of these calls used the exact same CID number as a call which Mr. Smith answered and wherein Defendants self-identified.

Complaint

37.     Mr. Smith alleges on information and belief that Defendants may have also transmitted the other calls not counted or detailed herein, which went unanswered, in order to pitch their automotive service plan services

## **USE OF AUTOMATIC TELEPHONE DAILING SYSTEM**

38.     As discussed above all of the prerecorded calls at issue were made or initiated with an autodialer because when he answered these calls sometimes he was greeted by an artificial voice or pre-recorded message that told him his auto warranty was about to expire and he should press "1" to speak to a live telemarketer about it.   All these pre-recorded messages were the same.

39.     In most of the calls that Plaintiff answered, when he answered he heard a prerecorded message or artificial voice that solicited his interest in purchasing an auto warranty or vehicle service contract

40.     The use of artificial or pre-recorded voices is a tell-tale indicator of mass-marketing by automation as opposed to manual or human-made calls, if a real person were manually dialing phone numbers he or she would simply speak, not play a recording.

41.     On the calls not using a prerecorded voice, when Plaintiff answered he experienced the tell-tale indicators that an autodialer had been used to make the

calls:  a strange silence or pause of "dead air" before the calling party came on the line even though they initiated the call; and/or strange clicking sounds before a live human telemarketer came on the line.

42.     Plaintiff also knows the calls were made with an autodialer because the telemarketers who came on the line did not at first know Plaintiff's name but also did not ask his name by way of introduction.  The telemarketers only spoke a scripted, standardized, and impersonal telephone solicitation pitch that sought to interest whomever might have been called in a service contract for his or her vehicle, the kind of standardized sales pitch used by automated mass-marketing dialers, not by human or manually-made phone callers to individually known consumers.

43.     Defendants' live telemarketers who came on the line never identified to Plaintiff their true first and last names or the actual, true name of the business on whose behalf they were soliciting.   Instead, they intentionally gave Plaintiff only fake first names that could not be used to accurately identify or locate Defendants.

44.     In some of the robocalls the subject of this case, Plaintiff instructed that his phone number be put on an internal "do-not-call" list and that he NOT receive further marketing calls.   Plaintiff's requests did not stop the calls — the calls continued.  (See Exhibit 1 for examples, though not entirely exhaustive as to all "do-not-call" requests).

## AGENCY AND DAMAGE ALLEGATIONS

45.     As discussed above, in order to fully identify all Defendants involved in transmitting the months and months of junk telemarketing alleged herein Plaintiff initiated the purchase of a policy to get the contractual paperwork, which is attached hereto and incorporated herein as Exhibit 2.

46.     Vehicle Protection Specialists, LLC ("VEHICLE") does primarily business and operates under its assumed or trade name "Auto Services" and its business is to manage, direct, control and operate call-centers that market vehicle service contracts ("VSCs") by outbound telemarketing

47.     Daniel Laurent is VEHICLE's sole listed member and manager and he dominates and controls VEHICLE meaning he sets and establishes all VEHICLE's policies, practices and operations, and controlled and directed VEHICLE's actions and inactions which are the subject of this Complaint.

48.     VEHICLE, at the direction and under the control of Laurent, is either directly operating its own call-center or has contracted with a marketing company to engage in call-center, robocall telephone solicitations n VEHICLE's behalf.

49.     VEHICLE and Laurent's purpose in making these calls is to sell the products and services of Sing For Service, LLC d/b/a MEPCO and Central Administrative Service Corporation Of Florida, Inc.

Complaint

50.    Laurent approves and controls the contracts, agreements and operations for robocalling on Defendants' behalf and approves and authorizes payment to the persons who do the actual robocalling.

51.    Plaintiff alleges on information and belief that Laurent designed, controls and approved the standardized telemarketing messages and sales pitches directed at consumers in the robocalling including the robocalling that harrassed Plaintiff as described below.

52.    Plaintiff alleges on information and belief that Laurent and VEHICLE have initiated or directed hundreds of thousands or millions of unlawful robocalls at consumers, using telemarketing sales scripts that only identify the callers with fake names so none of the Defendants can be identified.

53.    Plaintiff alleges on information and belief that Laurent and VEHICLE do not subscribe to the DNC Registry.

54.    Plaintiff alleges on information and belief that Laurent using VEHICLE to do so markets and sells vehicle service contracts provided, produced and administered by CARGUARD.

55.    Plaintiff alleges on information and belief that MEPCO by agreement with CARGUARD and VEHICLE finances the purchase price of CARGUARD's VSCs sold to consumers by VEHICLE's robocalling.

Complaint

56.     Plaintiff alleges on information and belief that VEHICLE receives a fee or commission from CARGUARD and/or MEPCO for each of CARGUARD's VSCs VEHICLE sells and MEPCO finances.

57.     Plaintiff alleges on information and belief that MEPCO allows VEHICLE access to MEPCO's information and operating systems so VEHICLE can sell VSCs with robocalling and financing. VEHICLE would not be able to sell any significant amounts of VSCs without MEPCO's financing and services.

58.     Plaintiff alleges on information and belief that MEPCO allows VEHICLE to enter consumer information into MEPCO's operational systems so MEPCO can profit from the robocalling and financing.

59.     Plaintiff alleges on information and belief that MEPCO allows Laurent and VEHICLE to use its service marks in VSC transactions with consumers on behalf of CARGUARD, including the transaction with Plaintiff described in more detail below, and as shown by the attached Exhibit 1 in support of this Complaint which includes the "Mepco Payment Plan Agreement".

60.     Plaintiff alleges on information and belief that MEPCO approves and provides the financing forms and agreements to be used with consumers in VEHICLE's robocall transactions.

61.     Plaintiff alleges on information and belief that MEPCO delegates to Laurent, VEHICLE and CARGUARD the ability to make a contract between

robocalled consumers including Plaintiff using parameters set by MEPCO, including MEPCO's absolute control over whether and under what circumstances it would accept Plaintiff or any other robocalled consumer as a customer.

62.     Plaintiff alleges on information and belief that MEPCO has received, reviewed and continues to regularly receive and review similar complaints from robocalled consumers about the products and services VEHICLE and CARGUARD provide. Many of these complaints have informed MEPCO that the products and services were sold by robocalls.

63.     Plaintiff alleges on information and belief that MEPCO knows that many of the VSCs it chooses to finance are sold via unsolicited phone calls including robocalls, and that the sellers would not be able to sell the VSCs or even profitably engage in robocalling without the substantial assistance and support of MEPCO's services and participation in the transactions with consumers who respond positively.

64.     Plaintiff alleges on information and belief that MEPCO chooses to not exercise supervision over the marketers it allows to use its services and service marks.  Instead, MEPCO chooses to remain willfully or consciously ignorant of whether or not the marketers to whom it assists with access to its information and operating systems, are complying with the Registry.

65.    Plaintiff alleges on information and belief that MEPCO facilitates, condones and relies on the robocalling because it is personally enriched by and profits from the same.

66.    Plaintiff alleges on information and belief that MEPCO controlled, controls, directs and directed Laurent and VEHICLE in the following manner without bothering to confirm whether Laurent and/or VEHICLE comply with the TCPA, the TSR and applicable state-laws:  MEPCO gave them access to MEPCO's information and operating systems so VEHICLE can sell VSCs with robocalling and financing; MEPCO allows them to enter consumer information into MEPCO's operational systems;  MEPCO allows them to use MEPCO's service marks in VSC transactions with consumers on behalf of CARGUARD; MEPCO approves and provides the financing forms and agreements to be used with robocalled consumers; MEPCO delegates to Laurent, VEHICLE and CARGUARD the ability to make a contract between robocalled consumers and MEPCO using parameters set by MEPCO, including its absolute control over whether and under what circumstances it would accept any robocalled consumer as a customer.

67.    Plaintiff alleges on information and belief that CARGUARD does not engage in direct marketing of the VSCs it produces and administers. CARGUARD

Complaint

arranges for and relies on third-party sellers such as Laurent and VEHICLE to directly market its products and services.

68.    In fact, in some jurisdictions CARGUARD is prohibited by law from engaging in direct marketing and is required to rely solely on third-party sellers such as Laurent and VEHICLE.   For example California Insurance Code § 12810 expressly provides that "No person, other than a seller, shall sell or offer for sale a vehicle service contract to a purchaser",  and  "No obligor shall use a seller as a fronting company and no seller shall act as a fronting company."  (The statutes defines "seller" to exclude VSC producers, administrators or obligors such as CARGUARD).

69.    CARGUARD has a legal duty, is expected and is required to exercise control and supervision over its sellers to see that the sellers comply with the TCPA, the TSR and applicable state-laws.

70.    Plaintiff alleges on information and belief that CARGUARD has received, reviewed and continues to regularly receive and review similar complaints from robocalled consumers about the products and services CARGUARD provides.  Many of these complaints have informed CARGUARD that the products and services were sold by robocalls.

71.    Plaintiff alleges on information and belief that CARGUARD is also made aware that Laurent and VEHICLE use robocalling to sell its products and

services when consumers make claims to CARGUARD.  Some of these consumers

describe how they acquired CARGUARD's products and services including the

marketing methods that brought CARGUARD's products and services to their

attention.

72.    CARGUARD's standard form of VSC it authorized Laurent and

VEHICLE to sell for it expressly, conspicuously directs the contract-holders to call

CARGUARD directly for claims.

73.    Plaintiff alleges on information and belief that CARGUARD

controlled, controls, directs and directed Laurent and VEHICLE in the following

manner without bothering to confirm whether Laurent and/or VEHICLE complied

with the TCPA, the TSR and applicable state-laws:  CARGUARD gave them

access to its information and operating systems so VEHICLE can sell

CARGUARD's VSCs with robocalling;  CARGUARD allows them to enter

consumer information into CARGUARD's operational systems;   CARGUARD

allows them to use CARGUARD's name in VSC transactions with consumers on

behalf of CARGUARD;  CARGUARD approves and provides the contract forms

and agreements to be used with robocalled consumers;  CARGUARD delegates to

Laurent and VEHICLE the ability to make a contract between robocalled

consumers and CARGUARD using parameters set by CARGUARD, including

CARGUARD's absolute control over whether and under what circumstances it would accept any robocalled consumer as a customer.

74.     Plaintiff alleges on information and belief that while it exercises control over Laurent and VEHICLE, CARGUARD knows or chooses to be consciously indifferent to the fact that the VSCs VEHICLE sells for it are sold via unsolicited phone calls including robocalls, that neither Laurent nor VEHICLE subscribe to or comply with the Registry, and that VEHICLE would not be able to sell the VSCs or even profitably engage in robocalling without the substantial assistance and support CARGUARD provides VEHICLE.

75.     Plaintiff alleges on information and belief that CARGUARD chooses to tolerate, condone and rely on VEHICLE's robocalling because it is personally enriched by and profits from the same.

76.     Plaintiff alleges on information and belief that minimal oversight by CARGUARD would confirm for CARGUARD that VEHICLE manages and operates call-centers without complying with the Registry, the TCPA or the TSR.

77.     Plaintiff alleges on information and belief that Defendants gave and continue to give substantial assistance or support to each other while knowing, consciously avoiding knowing or being recklessly indifferent to the fact that they are all engaged in acts or practices that violate the TCPA, the TSR and applicable state telemarketing laws.

Complaint

78.     Plaintiff alleges on information and belief that Defendants intentionally use robocalling because it allows for thousands of automated sales calls to be initiated in a very short period of time, but their sales representatives or telemarketers only need actually spend time on the phone with consumers who respond positively.  Defendants thereby illegally shift the cost of aggravation and wasted time to the public at large and away from themselves where it belongs.

79.     Mr. Smith has been harmed by the junk calls complained of herein by the direct waste of his time during the calls themselves, the indirect waste of time in having to break from other important tasks and spend time catching up after these junk calls, the waste of telephone service which he and not Defendants must pay for, the costs of having to pursue legal remedies, and in the aggravation and consequent health effects of stress these illegal intrusions have caused.

80.     Mr. Smith has been harmed to the extent of $100 it was necessary to pay to determine the identity of Defendants and the contractual relationships between them that could not be discovered in any way other than initiating purchase of their warranty service.

## FIRST CAUSE OF ACTION
[TCPA Violation – Do Not Call List – For All 91 Calls]

81.     Plaintiff realleges all paragraphs above and incorporates them herein by reference.

82.     Plaintiff is bringing this action pursuant to the provisions of the TCPA, specifically subdivision (c) (2) of Section 64.1200 of Title 47 of the Code of Federal Regulations which makes it unlawful for any person to "initiate any telephone solicitation" to "A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations".

83.     At all times relevant to this complaint, Plaintiff had registered his residential telephone number on the national do-not-call registry maintained by the U.S. Government.

84.     Defendants have called Plaintiff's residential telephone line for solicitation purposes more than one time per year during the statutory period of the last 4 years, pursuant to 28 U.S.C. § 1658.  These calls are the only calls known to Plaintiff at this time and Plaintiff states on information and belief, without yet having the aid of full discovery, that it is quite likely that Defendant has made many more violative calls to Plaintiff's residential telephone line.  These calls were not made in error, nor did Defendant have express permission from Plaintiff to call, nor did Defendant have a personal relationship with Plaintiff.  37 C.F.R. § 64.1200 (c) (i), (ii), & (iii).

85.     Subdivision (c)(5) of section 227 of title 47 of the United States Code permits a private right of action in state court for violations the national do-not-call

registry rules promulgated thereunder.  Plaintiff may obtain relief in the form of injunctive relief, or Plaintiff may recover $500.00 for each violation, or both.  If the court finds that defendants' violations were willful or knowing, it may, in its discretion, award up to three times that amount.

## SECOND CAUSE OF ACTION
[TCPA Violation – Autodialed Call To Wireless – For All 91 Calls]

86.     Plaintiff realleges all paragraphs above and incorporates them herein by reference.

87.     Plaintiff is bringing this action pursuant to the provisions of the TCPA, specifically subdivision (b) (1) (A) (iii) of Section 227 of Title 47 of the United States Code which makes it unlawful for any person to "Make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice...to any telephone number assigned to a paging service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call."

88.     Defendants have called Plaintiff's wireless number using an automatic telephone dialing system or an artificial or prerecorded voice during the statutory period of the last 4 years, pursuant to 28 U.S.C. § 1658.  These calls are only the calls known to Plaintiff at this time and Plaintiff states on information and belief,

without yet having the aid of full discovery, that it is quite likely that Defendant has made many more violative calls to Plaintiff's number assigned to a paging service.  These calls were not made for any emergency purpose, nor were these calls exempt under subdivision (c) of section 64.1200 of title 47 of the Code of Federal Regulations.

89.     Subdivision (b)(3) of section 227 of title 47 of the United States Code permits a private right of action in state court for violations of 47 U.S.C. §227 (b) (1) (A) (iii).  Plaintiff may recover $500.00 for each violation, or both.  If the court finds that defendants' violations were willful or knowing, it may, in its discretion, award up to three times that amount.


**THIRD CAUSE OF ACTION**
[Violation(s) of Florida Statutes Chapter 501, §§ 501.201, 501.059  –
For All 91 Calls]


90.     Plaintiff realleges all paragraphs above and incorporates them herein by reference.

91.     Plaintiff hereby brings this cause of action pursuant multiple subsections of the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes Chapter 501, §§501.201 et seq. (hereinafter "the FDUTPA") and §501.059

Complaint

the Telephone Solicitation statute, to recover his actual damages for Defendant's violations of the FDUTPA, and to recover his attorney fees and costs.

92.     Plaintiff is a resident of the State of Florida.

93.     The calls at issue herein were directed into the State of Florida at Plaintiff and his cell phone.

94.     Plaintiff and his cell phone were physically within the State of Florida at the times of all the calls at issue herein.

95.     Plaintiff pays taxes within the State of Florida, to the State of Florida and is entitled to the protection of the laws of the State of Florida.

96.     Each call to Plaintiff from Defendants or their agents as described above was a distinct violation of Florida Statutes §501.059(2):

> "Any telephone solicitor who makes an unsolicited telephonic
> sales call to a residential, mobile, or telephonic paging device
> telephone number shall identify himself or herself by his or her
> true first and last names and the business on whose behalf he or
> she is soliciting immediately upon making contact by telephone
> with the person who is the object of the telephone solicitation."

97.     Violating the TCPA and/or Florida Statutes §501.059(2) constitutes a violation of the Florida FDUTPA.

Complaint

98.     Each call to Plaintiff from Defendants or their agents the subject of this Complaint was a distinct violation of Florida Statutes §501.059(4):

"No telephone solicitor shall make or cause to be made any unsolicited telephonic sales call to any residential, mobile, or telephonic paging device telephone number if the number for that telephone appears in the then-current quarterly listing published by the department."

99.     The Florida Department of Agriculture and Consumer Services incorporates the national Do Not Call Registry into the quarterly listing published by that department.

100.    Furthermore, all calls to Plaintiff from Defendants or their agents made after Plaintiff communicated to them that he did not want to receive any more calls are separate, additional and distinct violations of Florida Statutes §501.059(5):

"A telephone solicitor or other person may not initiate an outbound telephone call or text message to a consumer or donor or potential donor who has previously communicated to the telephone solicitor or other person that he or she does not wish to receive an outbound telephone call or text message".

Complaint

101.   Each call to Plaintiff from Defendants was also an actionable unfair or deceptive trade practice under the UTPA because the UPTA covers violations of federal telemarketing laws and each call violated section 310.4 of the FTC's Telemarketing Sales Rule.  *See*, 16 C.F.R. §310 (FTC Telemarketing Sales Rule), *see also*, Florida Statutes §501.203(3)(a) (defining "violation of this part" of the UPTA as including violations of rules of the Federal Trade Commission).

102.   Laurent, CARGUARD and MEPCO additionally distinctly violated the UTPA because pursuant to 16 C.F.R. §310.3(b):

"It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§310.3(a), (c) or (d), or §310.4 of this Rule."

WHEREFORE Plaintiff prays for judgment against defendants, and each of them, as follows:

On the FIRST CAUSE OF ACTION:

1.   For an award of $500.00 for each violation of 47 C.F.R. §64.1200 (c) (2);
2.   For an award of $1,500.00 for each such violation found to have been willful;

Complaint

On the SECOND CAUSE OF ACTION:

    3.    For compensatory damages according to proof;

    4.    For punitive damages;

On the THIRD CAUSE OF ACTION:

    5.    For damages according to proof, but not less than the $100 taken by Defendants;

    6.    Recission of any and all contracts between Plaintiff and Defendants;

    7.    For attorney's fees;

    8.    For costs of suit herein incurred;

On ALL CAUSES OF ACTION:

    9.    For attorney's fees pursuant to California Code of Civil Procedure § 1021.5.

    10.  Injunctive relief to prevent future illegal telemarketing calls;

    11.  For costs of suit herein incurred; and

    12.  For such further relief as the Court deems proper.


DATED: July 10/2020            **PRATO & REICHMAN, APC**


                        <u>/s/Christopher J. Reichman, Esq.</u>
                        By: Christopher J. Reichman, Esq.
                        **Prato & Reichman, APC**
                        Attorneys for Plaintiff
                        JONATHAN SMITH